UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TROY I. WEBSTER,

      Plaintiff,

v.              Case No. 20-cv-880-pp

KEITH LOEHRKE, JENNIFER WORTHEN,
NICKOL BURMEISTER, ADAM BALTZ,
FRANKLIN RICE, TOM LARSON
and CINDY BARTER, RN,

      Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 81)**

    Troy I. Webster, who previously was incarcerated in a Wisconsin state prison, filed this civil rights lawsuit under 42 U.S.C. §1983. Dkt. No. 1. In the operative second amended complaint,[1] the plaintiff alleges that due to symptoms from multiple sclerosis (MS), he fell, hit his head, lost consciousness, experienced severe pain and "pins and needles" in his legs and groin area and the defendants did not help him or obtain medical care for him, in violation of his rights under the Eighth Amendment to the United States Constitution and Wisconsin state law. Dkt. No. 55 at 6-14; Dkt. No. 54 at 1-2. The defendants have filed a motion for summary judgment. The court will grant

---

[1] The plaintiff's second amended complaint is titled Fourth Amendment Complaint with Jury Demand and Wisconsin State Negligence Claims. Dkt. No. 55.

1

the motion as to defendant Barter and deny the motion as to defendants Loehrke, Worthen, Burmeister, Baltz, Rice and Larson.

I. **Facts**[2]

The plaintiff was incarcerated at the Redgranite Correctional Institution when the incident described in the second amended complaint took place. Dkt. No. 91 at ¶1. On December 1, 2019, the plaintiff and his cellmate John Brush were housed in cell C-10 in Redgranite's restrictive housing unit ("RHU"). Id. at ¶2. That evening, the plaintiff experienced symptoms of numbness, weakness, dizziness and paralysis in his legs due to a flare-up of his MS. Dkt. No. 55 at ¶41. He fell and hit his head on the cell's sink or toilet, causing temporary unconsciousness. Id. at ¶42; Dkt. No. 91 at ¶¶3, 5. At about 8:20 p.m., Brush pushed the cell's "medical emergency button" to alert staff to the plaintiff's medical emergency. Dkt. No. 55 at ¶43; Dkt. No. 91 at ¶¶4-5.

Defendant Officer Jennfier Worthen arrived at the cell and Brush informed her that the plaintiff had hit his head, was knocked unconscious for a short period of time and had a head injury. Dkt. No. 55 at ¶44; Dkt. No. 91 at ¶7. Worthen did not seek medical advice to determine the severity of the plaintiff's medical condition to see if it could wait until morning. Id. at ¶8. Worthen told Brush that nursing staff was not on duty and that the plaintiff

---

[2] Unless otherwise noted, the court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c). This section includes facts from the plaintiff's verified second amended complaint, dkt. no. 55, the defendants' unopposed proposed findings of fact, dkt. no. 83, and the plaintiff's unopposed proposed findings of fact, dkt. no. 91.

would have to wait until morning to be seen, and she walked away. Dkt. No. 55 at ¶44.

Brush continued to press the medical emergency button. Id. at ¶45. At 9:20 p.m., defendant Officer Nickol Burmeister responded over the intercom, Brush explained the situation to Burmeister and the plaintiff yelled, "I need help!" Id. at ¶46. Burmeister responded, "talk to the Sgt. when he does his rounds." Id.

At 9:45 p.m., defendant Sergeant Keith Loehrke arrived at the cell and asked what happened. Id. at ¶47. Brush informed him of the plaintiff's head injury and that the plaintiff was in severe pain. Dkt. No. 91 at ¶10. Loehrke asked the plaintiff what was going on and the plaintiff responded, "help me, headache, my head hurts, my legs are painful and tingling, I can't stand or walk and I can't feel my groin." Dkt. No. 55 at ¶47. Id. Loehrke told him, "HSU [Health Services Unit] is gone and no one is here," and asked what was normally done when this happened and what the plaintiff wanted him to do. Id. The plaintiff responded that he had bladder problems when it hurt like this and that he needed a doctor. Id. Loehrke told the plaintiff that he could "drop a blue slip" and that the plaintiff could get help when HSU arrived in the morning. Id. The plaintiff responded, "I need help now, call someone!" Id. Loehrke told the plaintiff that if he had a blue slip, Loehrke would drop it in the box for the plaintiff. Id. The plaintiff asked for a supervisor, but Loehrke slammed the trap door and walked away. Id. at ¶48. Loehrke did not seek

3

medical advice to determine the severity of the plaintiff's medical condition to see if it could wait until morning. Dkt. No. 91 at ¶11.

Defendants Sergeant Baltz and Officer Rice were on the duty in the RHU on third shift on December 1, 2019. Id. at ¶12. At 11:07 p.m., a medical emergency was called for another incarcerated individual in the RHU. Id. at ¶13.

At 10:20 p.m., Brush asked Rice, who was doing his rounds, if anyone was coming to help the plaintiff. Dkt. No. 55 at ¶51. Rice looked confused, showed no interest in the plaintiff's injuries and walked away from the cell door. Id. at ¶52. Rice informed Baltz of the plaintiff's injuries. Id. at ¶53. Rice received multiple requests for medical attention from the plaintiff and Brush that put him on notice of the plaintiff's injury and request for medical attention. Dkt. No. 91 at ¶18. Rice did not seek medical advice or defer to a medical professional to determine the severity of the plaintiff's medical condition. Id. at ¶19.

Baltz conducted the first rounds of his shift around 11:00 p.m. Dkt. No. 83 at ¶2. When Baltz approached the plaintiff's cell, Brush informed Baltz that the plaintiff had a medical complaint. Id. The plaintiff spoke to Baltz through his cell door in a "normal manner" and asked to be seen by the HSU. Id. at ¶3. The parties describe this conversation differently.

According to the defendants, the plaintiff did not appear to be in distress, displayed no visible injuries (bleeding, slurred speech, cuts, scratches, open wounds) and he stood freely. Id. Baltz told the plaintiff that he would report his

concern to his shift supervisor, defendant Captain Larson. Id. at ¶4. When Baltz did this, Larson told him to continue to monitor the plaintiff and that Larson would notify HSU. Id. Per RHU policy, the plaintiff was checked every half hour for the rest of the night during regular rounds and into the next morning at which time he was seen by HSU staff. Id. at ¶6.

According to the plaintiff, Brush informed Baltz that the plaintiff had fallen, hit his head on the sink and was seeking medical attention from second shift but was not seen by HSU staff or any medical professional. Dkt. No. 91 at ¶14. Baltz was aware that the plaintiff and Brush made multiple requests for medical attention during third shift and, after receiving multiple requests, Baltz threatened the plaintiff and Brush with further punishment if they continued to request medical attention. Id. at ¶15. Brush and the plaintiff notified Baltz of the plaintiff's fall, injury and complaints of severe pain, numbness and tingling in his legs and sensitivity to light. Id. at ¶16. Baltz did not seek medical advice or defer to a medical professional to determine the severity of the plaintiff's medical condition to see if it could wait until morning. Id. at ¶17. It is undisputed that Baltz notified his supervisor, defendant Larson, but Larson did not provide medical attention to the plaintiff. Dkt. No. 55 at ¶¶59-61.

Defendant Nurse Barter was the on-call nurse at Redgranite and one of her duties was to provide telephone consultation and direction for patients at Redgranite when a registered nurse was not on-site. Dkt. No. 83 at ¶7. If Barter received a call from a staff member at Redgranite about an incarcerated individual's medical concern during on-call hours, it would be her standard

5

practice to document those concerns, along with her recommendations, in that individual's record. Id. at ¶8. Barter found no documentation in the plaintiff's medical record indicating that she received a call concerning the plaintiff on December 1, 2019. Id.

The plaintiff submitted a Health Services Request slip on December 1, 2019 reporting, "Numbness in legs fell, bumped head on sink, numbness into groin [ ] AND legs pins and needles [sic]." Dkt. No. 85-1 at 16. This request slip was stamped received by HSU on December 2, 2019, and Nurse Klenke (not a defendant) checked the box indicating that the plaintiff was scheduled to be seen for a nursing sick call that day. Id.; Dkt. No. 83 at ¶9.

On the morning of December 2, 2019, Sgt. Ralls and Officers Drovers and Stichman (not defendants) were on duty in the RHU. Dkt. No. 91 at ¶20. The plaintiff spoke with Stichman and requested medical attention for the injuries that he received from his fall the night before. Id. In Ralls's incident report, he said that the plaintiff was still in pain, confused and unable to stand without falling into the cell wall, indicating the plaintiff was suffering from his injuries. Id.; Dkt. No. 91-1 at 30.

Nurse Garcia (not a defendant) saw the plaintiff on December 2, 2019 at 6:45 a.m. for a chief complaint of "MS" flare. Dkt. No. 83 at ¶10. Garcia noted that the plaintiff reported, "I fell at 8:15pm last night and I hit my head and now my neck hurts." Id. Nurse Garcia conducted a neurological assessment on the plaintiff; his vital signs were within normal limits, he was able to move his neck with no issues and denied back pain or illness. Id. at ¶11. The plaintiff

6

was referred to Advanced Practice Nurse Prescriber Christine Burnett (not a defendant) that day for complaints of exacerbation of MS and she assessed him at about 4:20 p.m. Id. at ¶12. The plaintiff had no alteration in mental status, consciousness, balance, or function and he denied head pain. Id. He had full range-of-motion without pain in his extremities and was able to push himself up on the table with his legs. Id.

Nursing staff saw the plaintiff eight times on December 2, 2019, and again on December 3, 2019 for neurological checks. Id. at ¶13. All assessments were within normal limits and there was no change in level of consciousness. Id. He was graded with the highest possible score for all areas of motor response and function, meaning there was no evidence of a brain injury. Id. Burnett saw the plaintiff for a follow-up appointment on December 3, 2019. Id. at ¶14. His presentation was at his baseline, and she noted no abnormalities. Id.

Barter saw the plaintiff on December 5, 2019 for a nurse sick call appointment for a chief complaint of difficulty urinating, headache and Imitrex use, light sensitivity, dizziness and neck pain. Id. at ¶15. She completed the nursing protocols for genitourinary, musculoskeletal and neurological complaints. Id. Barter noted that neurologically, the plaintiff complained of bilateral thigh and groin numbness and tingling, along with head and neck pain. Id. at ¶16. He previously had been prescribed pregabalin for his chronic numbness, tingling, pain and weakness to his bilateral legs. Id. He previously was prescribed acetaminophen and sumatriptan for his headaches and history

of migraines. Id. Barter reported that her neurological assessment of the plaintiff was unremarkable and at his baseline for his headache and leg issues except for "possible slight area of swelling with no discoloration to the center of the forehead at the hairline." Id. at ¶17. His neck assessment also was unremarkable with demonstration of full range of motion. Id.

Barter's interventions included to continue the plaintiff's plan of care as established by the prescriber and per nursing protocol. Id. at ¶19. She issued the plaintiff a bag for ice as well as muscle rub for his reported neck discomfort. Id. Barter scheduled follow-up care appointments and notified the advanced care provider of the plaintiff's abnormal assessment findings of urinary retention or decreased urine output, verbal statements of inability to urinate, reports of talking funny and not making sense, pain and swelling to area of forehead and neck pain. Id. at ¶20. She obtained verbal orders to place a urinary catheter due to the plaintiff's continued reports of inability to void with groin and leg numbness and tingling. Id. The plaintiff was placed in a "sick cell" in HSU due to the urinary catheter placement and continued urinary catheter care. Id. at ¶21. Barter advised the plaintiff to continue the plan of care for pain management, including already prescribed acetaminophen and gabapentin. Id. She provided the plaintiff with education on urinary catheter and care and issued hygiene items to the plaintiff. Id.

On January 14, 2020, the plaintiff was seen at the UW-Madison Neurology Multiple Sclerosis clinic for a routine follow-up appointment.[3] Dkt. No. 91 at ¶28; Dkt. No. 91-1 at 48-50. He discussed his fall with APNP Wilke, who discussed the expected healing of post-concussive syndrome. Id. Wilke opined that the plaintiff's headaches were worse after the concussion. Id.

On December 14, 2020, the plaintiff had a follow-up visit with Dr. Natasha Frost in UW Health's Neurology department for his MS. Dkt. No. 83 at ¶22. An MRI of his brain was performed, which did not reveal any changes from previous imaging. Id. Frost could not state with medical certainty that the plaintiff's symptoms were caused by MS. Id.

According to the plaintiff, he suffered from his injury for four months after his fall. Dkt. No. 91 at ¶27. Those symptoms included headaches, dizziness and sensitivity to light. Id. He routinely requested medical attention and advice on how to resolve the painful symptoms after his fall by submitting requests to the HSU complaining of the above-mentioned symptoms. Id.

## II. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317,

---

[3] The plaintiff's proposed findings of fact incorrectly state that this appointment took placed on January 14, 2019.

324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.     Discussion

The defendants contend that the plaintiff's Eighth Amendment claim fails as a matter of law because he was not harmed by waiting until morning to see a nurse and therefore does not have an actionable injury. Dkt. No. 82 at 5. According to the defendants, although the plaintiff believes they should have provided him with medical care immediately, "the medical protocol for addressing the plaintiff's condition would have been the same in the evening as

10

it was in the morning: rest and monitor." Id. at 6. The defendants also contend that they did not act unreasonably in waiting until morning to take the plaintiff to the HSU because he was not suffering from a medical emergency. Id. at 10-11. Finally, the defendants contend that they are entitled to qualified immunity. Id. at 11-14.

The court analyzes a plaintiff's claim that prison staff were deliberately indifferent to his serious medical needs under the Eighth Amendment's cruel and unusual punishments clause. Estelle v. Gamble, 429 U.S. 97, 104 (1976). An Eighth Amendment claim consists of both objective and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must show that he "is incarcerated under conditions posing a substantial risk of serious harm." Id. In the context of a claim that prison staff were deliberately indifferent to a plaintiff's serious medical need, the objective component requires the plaintiff to show that his medical need constituted a risk of an objectively serious harm. Stewart v. Wexford Health Sources, Inc., 14 F.4th 757, 763 (7th Cir. 2021) (citing Balsewicz v. Pawlyk, 963 F.3d 650, 654 (7th Cir. 2020)).

To satisfy the subjective component, the plaintiff must demonstrate that the defendant had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837). "The standard of deliberate indifference 'requires more than

11

negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk.'" Stewart, 14 F.4th at 763 (quoting Huber v. Anderson, 909 F.3d 201, 208 (7th Cir. 2018)). The evidence must show the defendant's "actual, personal knowledge of a serious risk, coupled with the lack of any reasonable response to it." Ayoubi v. Dart, 724 F. App'x 470, 474 (7th Cir. 2018) (citing Farmer, 511 U.S. at 837, 844-45).

The parties dispute whether the plaintiff had a medical emergency that required immediate medical attention. A reasonable factfinder could conclude that the plaintiff's head injury, loss of consciousness, inability to stand and persistent pain constituted a serious medical need that satisfies the objective component of an Eighth Amendment claim. See Gutierrez v. Peters, 111 F.3d 1364, 1371 (7th Cir. 1997) (citing Murphy v. Walker, 51 F.3d 714 (7th Cir. 1995)) (detainee who alleged he suffered a "severe head injury from slip and fall" stated claim for inadequate medical treatment); Walker v. Benjamin, 293 F.3d 1030, 1040 (7th Cir. 2002) (allegations of severe and persistent pain may satisfy objective component).

The plaintiff has sued one medical professional, Nurse Barter. In the context of a claim of deliberate indifference against a medical provider, the subjective component requires the plaintiff to show that the medical professional's treatment decision was "so inadequate that it demonstrated an absence of professional judgment." Stewart, 14 F.4th at 763 (quoting Johnson v. Dominguez, 5 F.4th 818, 826 (7th Cir. 2021)); see also Brown v.

12

Osmundson, 38 F.4th 545, 551 (7th Cir. 2022). Barter was the on-call nurse on the night of the incident; she was not present at the institution. According to the defendants, she did not receive a call regarding the plaintiff after his fall. The plaintiff does not dispute this and, because he does not contend in his response brief that Barter violated his rights, he appears to concede that Barter is not liable. The plaintiff has not shown that Nurse Barter had any involvement in the defendants' alleged failure to obtain medical assistance for him in the hours after he fell. The court will grant the defendants' motion for summary judgment as to Barter.

The other defendants—Worthen, Burmeister, Loehrke, Rice, Baltz and Larson—are not medical professionals. Non-medical defendants can rely on the expertise of medical personnel, Arnett v. Webster, 658 F.3d 742, 755 (7th Cir. 2011); McGee v. Adams, 721 F.3d 474, 483 (7th Cir. 2013), unless they have "reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." Hayes v. Snyder, 546 F.3d 516, 527 (7th Cir. 2008) (quoting Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004)); see also King v. Kramer, 680 F.3d 1013, 1018 (7th Cir. 2012) (officers are "entitled to defer to the judgment of jail health professionals" so long as they do not ignore an incarcerated individual).

> Non-medical defendants cannot simply ignore an inmate's plight. See *Greeno [v. Daley]*, 414 F.3d [645,] at 656 [(7th Cir. 2005)] (stating that "[p]erhaps it would be a different matter if [the non-medical defendant] had ignored Greeno's complaints entirely, but we can see no deliberate indifference given that he investigated the complaints and referred them to the medical providers who could be expected to address Greeno's concerns."); *see also Berry [v. Peterman]*, 604 F.3d [435,] at 440 [(7th Cir. 2010)] ("As a nonmedical

13

administrator, [the defendant] was entitled to defer to the judgment of jail health professionals so long as he did not ignore [the inmate]."). However, mere negligence in failing to detect and prevent subordinates' misconduct is not sufficient. *See Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996). The plaintiff must demonstrate that "the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety.'" Id. (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 . . . (1994)). Once an official is alerted of such a risk, the "refusal or declination to exercise the authority of his or her office may reflect deliberate disregard." *Id.*

Arnett, 658 F.3d at 755-56.

In this case, the plaintiff contends that the non-medical defendants essentially ignored his plight by refusing to get him medical assistance and he has presented evidence that the non-medical defendants turned a blind eye to his treatment. After the plaintiff fell and hit his head, he and/or Brush told Worthen, Burmeister and Loehrke that the plaintiff fell and hit his head, was knocked unconscious for a short period of time and was in pain. A reasonable factfinder could conclude that the failure of these defendants to seek medical attention for the plaintiff constituted deliberate indifference. On third shift, the plaintiff and/or Brush told Rice and Baltz about the plaintiff's condition and they did not seek medical attention for the plaintiff. Rice told Baltz about the plaintiff, but the plaintiff also says that Rice received multiple requests for medical attention from the plaintiff and Brush. According to the plaintiff, Baltz told the plaintiff and Brush that if they continued pressing their medical emergency button, they would get a conduct report. Baltz told Captain Larson about the plaintiff's condition and, instead of seeking medical assistance, Larson directed that staff regularly check in on the plaintiff per RHU policy.

14

And while Larson told Baltz that he would contact the HSU, the HSU was closed at that hour so contacting HSU could not have gotten the plaintiff immediate help. According to the plaintiff, that night a medical emergency was called for another incarcerated individual in the RHU; presumably, this means that the plaintiff could have received medical attention if the defendants had deemed his condition emergent. A reasonable factfinder could conclude that Baltz, Rice and Larson acted with deliberate indifference by not seeking medical intervention for the plaintiff.

In their reply brief, the defendants contend that the plaintiff has not submitted objective medical evidence that he suffered post-concussive syndrome and that the "temporary and fleeting discomfort" the plaintiff suffered is not an actionable injury under §1983. Dkt. No. 94 at 1. The court already has determined that a reasonable factfinder could conclude that the plaintiff had a serious medical need under the Eighth Amendment's objective standard. The plaintiff's verified second amended complaint and the medical record support a finding that the plaintiff suffered a physical injury from his fall and that he was experiencing pain when he and Brush spoke with the defendants. The defendants also contend that the plaintiff's summary judgment response "greatly exaggerates" his documented condition after he fell, that he said in his health service request only that he bumped his head on the sink and felt numbness and "pins and needles" and that Brush's declaration that the plaintiff was unresponsive for at least fifteen minutes, unable to form sentences, keep his eyes open or make normal communication, couldn't stand,

15

was visibly in pain and laid in his bed moaning in pain for hours waiting for someone to help him is contradicted by the plaintiff's statements and the medical record. Dkt. No. 94 at 2-3. However, the medical record does not contain information about the plaintiff's condition in the hours after his fall because medical staff did not see him during that time. The record does show that when first shift staff arrived in the morning, the plaintiff's condition was described as still in pain, confused and unable to stand without falling into the cell wall, which indicates the plaintiff was suffering from his injuries, and he received medical assistance at 6:45 a.m. And Brush's declaration is consistent with the plaintiff's description of his physical condition in the hours after he fell as set forth in the second amended complaint. A reasonable factfinder could conclude that the non-medical defendants acted with deliberate indifference by ignoring the plaintiff's requests for medical care in the hours after he fell.[4]

The defendants contend that they are entitled to qualified immunity. Qualified immunity "protects government officials from suit for damages when their conduct does not violate clearly established statutory or constitutional rights." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Determining whether a state official is entitled to qualified immunity involves two inquiries: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." Williams v. City of Chi.,

---

[4] The defendants' summary judgment motion does not address the plaintiff's state law claims.

16

Case 2:20-cv-00880-PP   Filed 08/18/23   Page 16 of 18   Document 97

733 F.3d 749, 758 (7th Cir. 2013). If either inquiry can be answered in the negative, the official is entitled to summary judgment.

Courts may address the two prongs of qualified immunity in either order. Pearson, 555 U.S. at 236. A right is clearly established if a "reasonable official would have understood what he is doing violates that right." Reichle v. Howards, 566 U.S. 658, 664 (2012) (internal quotations and brackets omitted). "[T]he crucial question [is] whether the official acted reasonably in the particular circumstances that he or she faced." Kemp v. Liebel, 877 F.3d 346, 351 (7th Cir. 2017)).

The defendants contend that the plaintiff must show that it was beyond debate to someone in the defendants' positions that they would violate the plaintiff's constitutional rights by not providing emergency medical care for a "superficial, non-emergent medical condition" and that he cannot make such a showing. Dkt. No. 82 at 12-13. The record does not support the defendants' analysis because a reasonable factfinder could conclude that the plaintiff's head injury, pain, inability to stand, numbness and "pins and needles" constituted a serious medical need and that the defendants acted with deliberate indifference when they failed to obtain medical care for him. The law was clearly established in 2019 that a head injury, unless "obviously superficial," should ordinarily be considered serious and merits attention until properly diagnosed as to its severity. Murphy v. Walker, 51 F.3d 714, 719 (7th Cir. 1995). While the parties dispute the severity of the plaintiff's condition, the plaintiff asserts that in addition to his head injury and short-term loss of

17

consciousness, he suffered from pain, inability to stand, numbness and feeling of "pins and needles." The defendants are not entitled to qualified immunity.

The court will grant the defendants' motion for summary judgment as to Barter and dismiss her as a defendant. The court will deny the defendants' motion for summary judgment as to the remaining defendants. The plaintiff's Eighth Amendment claim and his state law negligence claim (which the defendants' summary judgment motion does not address) survive.

### III. Conclusion

The court **GRANTS IN PART AND DENIES IN PART** the defendants' motion for summary judgment. Dkt. No. 81. The court denies the defendants' motion as to the plaintiff's Eighth Amendment claim against Worthern, Burmeister, Loehrke, Rice, Larson and Baltz. The court grants the defendants' motion as to the plaintiff's claims against Barter.

The court **DISMISSES** defendant Barter.

The court **ORDERS** that the parties must appear for a telephone status conference on **September 12, 2023 at 2:30 PM** to discuss the next steps in the litigation. The parties must appear by calling the court's conference line at 551-285-1373 and entering Meeting ID 161 4901 8989 and Passcode 190021 when prompted.

Dated in Milwaukee, Wisconsin this 18th day of August, 2023.

BY THE COURT:

_____
**HON. PAMELA PEPPER
Chief United States District Judge**